**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|                        |   |                        |
|------------------------|---|------------------------|
| **JANICE A. WEISEL,**  | * |                        |
| Plaintiff              | * |                        |
| v.                     | * | CIVIL NO. JKB-19-3281  |
| **KAIMETRIX, LLC,**    | * |                        |
| Defendant              | * |                        |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Plaintiff Janice A. Weisel sued her former employer, Kaimetrix, LLC ("Kaimetrix"), for abusive discharge in violation of Maryland public policy as well as retaliation, sex discrimination, and age discrimination in violation of federal and state law. Kaimetrix moved for judgment on the pleadings as to her claims for sex and age discrimination in violation of Maryland law.[1] The matter is fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Kaimetrix's motion for judgment on the pleadings will be granted.

### I. *Factual and Procedural Background*[2]

Kaimetrix hired Weisel as a business analyst expert around August 20, 2018 to work at the Defense Information Systems Agency ("DISA"), a United States Department of Defense agency headquartered at Fort Meade, Maryland that had a contract with Kaimetrix. (Compl. ¶¶ 16, 18–19, ECF No. 1; Mot. Judgement at 1–2, ECF No. 14.) On November 2, 2018, Weisel claims that

---

[1] Kaimetrix also moved for judgement on the pleadings as to Weisel's abusive discharge claim, but Kaimetrix acknowledges that this request is now moot in light of the Court's Order granting Kaimetrix's previous motion for judgment on the pleadings as to this count. (*See* Order, ECF No. 18.)

[2] The facts in this section are taken from the Complaint and construed in the light most favorable to Weisel. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

a co-worker, Kurt Ponting, "verbally threatened to kill everyone" during an employer-sponsored luncheon, which was also attended by her immediate supervisor, Lauren Sheriff. (*Id.* ¶¶ 24–25.) On November 5, Weisel told Sheriff, as well as her second-level supervisor, Adam Nash, the Talent Services Director, William Essrow, and the Chief Technology Officer, Kyle Shrauger, about Ponting's threat to kill everyone. (*Id.* ¶¶ 28–29.) Weisel had already told Essrow and Nash that Ponting "made her feel uncomfortable and created a hostile work environment" based on his anger and insubordination before Ponting made his threat. (*Id.* ¶¶ 21–23.) Sheriff told Weisel not to report the incident to DISA. (*Id.* ¶ 29.) The following day, Sheriff again told Weisel not to report this incident. (*Id.* ¶ 30.) Weisel told Sheriff that they were "legally obligated to report Mr. Ponting's threat of violence." (*Id.*) Sheriff told Weisel that she was worried Ponting could lose his security clearance or job if the incident was reported. (*Id.*)

On November 7, Weisel told Sheriff that she would report Ponting's threat to DISA, and Sheriff again told Weisel not to report the incident. (*Id.* ¶ 31.) Sheriff told Weisel that if she felt threatened, "she could work somewhere else." (*Id.* ¶ 32.) That same day, Weisel reported Ponting's threat to "DISA Security" and told Sheriff she had done so. (*Id.* ¶ 33.) On November 8, Weisel filed a written complaint with DISA's Workplace Violence Prevention & Response Office. (*Id.* ¶ 34.) She also told Kaimetrix's "upper management" that Kaimetrix "had a legal obligation to report Mr. Ponting's threat to DISA . . . and to remove him from the work premises," neither of which had been done. (*Id.* ¶ 36.) Nash and Shrauger told Weisel she was being "unprofessional and chastised her for wanting to report Mr. Ponting's threat of violence to DISA." (*Id.* ¶ 37.) Kaimetrix terminated Weisel's employment on November 13, 2018. (*Id.* ¶ 38.)

Weisel alleges that similarly situated male employees, as well as similarly situated younger employees, were not terminated for their "threatening" and/or "unprofessional" behavior, and that she was subject to adverse treatment based on her age and gender. (*Id.* ¶¶ 101, 108.)

Kaimetrix filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) as to Count VI for sex discrimination and Count VII for age discrimination, both in violation of Md. Code Ann., State Gov't § 20-606. (Mot. Judgement at 1–2.) The sole issue is whether the federal enclave doctrine bars Weisel's state law claims of sex and age discrimination.

## II.     *Standard*

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is evaluated using the same standard applicable to motions to dismiss under Rule 12(b)(6). *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of the mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. Courts must "accept the well-pled allegations of the complaint as true, . . . constru[ing] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts need not accept legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

### III. Analysis

Kaitmetrix argues that Weisel's state law employment discrimination claims based on her age and sex must fail because of the federal enclave doctrine, which dictates whether federal or state law applies on land that states cede to the federal government, such as Fort Meade. (Mot. Judgement Mem. at 4–9, ECF No. 14-1.) The authority for the federal government to take control of state territory is provided for in Article 1, Section 8, Clause 17 of the United States Constitution. This provision provides Congress with the power:

> To exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be . . .

U.S. Const. Art. I, § 8, cl. 17. Pursuant to this provision, the Supreme Court has explained that "a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States." *Paul v. United States*, 371 U.S. 245, 268 (1963). Therefore, "only state law existing at the time of the acquisition remains enforceable, not subsequent laws." *Id.*

Accordingly, whether state law applies on a federal enclave depends on whether the state law in question was in existence at the time of the cessation. "[A] state law in effect at the time of cessation continues in effect as long as it does not conflict with federal purposes." *Colon v. United States*, 320 F. Supp. 3d 733, 746 (D. Md. 2018). However, "a subsequent state law has no effect unless (1) at the time of cessation the state specifically retained jurisdiction over the subject matter at issue or (2) Congress specifically authorized the enforcement of the state law on the federal enclave." *Id.*; *see also Stokes v. Adair*, 265 F.2d 662, 665 (4th Cir. 1959) ("[O]nly the state laws in effect at the time of the transfer of jurisdiction continue in effect and . . . subsequent statutes of

the state are not part of the laws of the ceded area unless Congress takes action to keep them current.").

In 1906, Maryland passed the law which provided authority to cede the territory which was to become Fort Meade to the federal government. *See Baltimore Gas & Elec. Co. v. United States*, 133 F. Supp. 2d 721, 742 (D. Md. 2001) (discussing history of Fort Meade). Fort Meade was ultimately established in 1917. *Id.* The Maryland statute which granted authority to the federal government to acquire Fort Meade provided in part:

> That exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State, but the jurisdiction so ceded shall continue no longer than the United States shall own such lands.

*Id.* (citing Chapter 743 of the 1906 Laws of Maryland, AR Tab 16). Over time, Maryland ceded additional property to the federal government to expand Fort Meade. *See* Md. Gen. Provis. § 6-203. This later grant of authority provided that "for as long as the United States shall own the land, the State cedes exclusive jurisdiction to the United States over all that certain tract or parcel of land situate in Anne Arundel County, being a portion of the Fort George G. Meade Military Reservation," with the exception that the state would "retain[] the right to: (1) serve all civil and criminal process of the courts of the State; and (2) enforce and ensure compliance with all applicable environmental and Public Service Commission laws and regulations." *Id.*

Kaimetrix alleges, and Weisel does not dispute, that the latest the land at issue could have been ceded to the federal government was 1993. (Mot. Judgement Mem. at 2.) However, Maryland's law prohibiting sex and age discrimination in employment only established a private right of action for conduct occurring on or after October 1, 2007. *See Butler v. Giant Food, Inc.*, Civ. No. PJM-07-3431, 2008 WL 5501182, at *2 (D. Md. May 23, 2008), *aff'd*, 294 F. App'x 56

(4th Cir. 2008). Therefore, no private right of action existed for Weisel's claims of age and sex discrimination in employment under Maryland law at the time Maryland ceded the land that became Fort Meade to the federal government.

Weisel does not dispute that the conduct in question occurred on a federal enclave by virtue of being located within Fort Meade. Nor does Weisel allege that Md. Code Ann., State Gov't § 20-606 was in existence at the time the land in question was ceded to the federal government. Rather, Weisel cites to the decision in *Gillis v. Am. Pest Mgmt., Inc.*, Civ. No. AW-03760, 2012 WL 786282 (D. Md. Mar. 7, 2012) in support of her argument that the federal enclave doctrine does not preclude her claims. (Opp'n Mot. at 3–4, ECF No. 22.) In *Gillis*, the plaintiff brought a claim in state court for discrimination in violation of Maryland law for actions which occurred while the plaintiff worked on the National Institutes of Health campus, another federal enclave located within Maryland. *Gillis*, 2012 WL 786282 at *1. The defendant removed the action to federal court, arguing that federal, and not state, discrimination law applied because the conduct at issue occurred on a federal enclave. *Id.* The court remanded the case to state court, citing a 1943 Maryland statute which "limited any cession of jurisdiction it might make to the United States so that it would retain concurrent jurisdiction." *Id.* at *2 (citing Md. Code. Ann., State Gov't § 14-102 (1984)). Therefore, the court in *Gillis* found that Maryland state discrimination law still applied to conduct which occurred at the National Institutes of Health due to Maryland's concurrent jurisdiction over the territory.

Though Weisel relies solely on *Gillis* to support her argument, the case at issue here is distinguishable from *Gillis*. First, *Gillis* concerned action taken on land ceded to the United States in 1953—ten years after Maryland's law establishing concurrent jurisdiction was passed. *Id.* at *2. This case, however, concerns land officially ceded to the federal government in 1917. *See*

*Baltimore Gas*, 133 F. Supp. 2d at 742. Thus, to the extent the conduct at issue here occurred on land ceded to the federal government prior to 1943, there is no question that Maryland's later law limiting grants of jurisdiction would not apply. *See Colon*, 320 F. Supp. 3d at 747 ("[A] state statute promulgated *after* the cessation of a federal enclave cannot possibly be the vehicle by which a state retains jurisdiction over a particular subject matter on that federal enclave.").

Second, even if the land on which DISA is located was ceded to the federal government in 1993—something Weisel does not contend—the statute governing later cessations related to Fort Meade specifically provides the federal government with "exclusive jurisdiction" over the land in question, with only two exceptions for service of civil and criminal process and compliance with "environmental and Public Service Commission laws and regulations." Md. Gen. Provis. § 6-203. Had the state of Maryland wished to maintain concurrent jurisdiction or carve out exceptions for employment discrimination statutes on Fort Meade, it could have done so. The state chose not to do so, and therefore subsequent state laws not specifically carved out by the authorizing statute are clearly barred by the federal enclave doctrine. *See, e.g.*, *Fuller-Deets v. Nat'l Institutes of Health*, Civ. No. GJH-18-3175, 2020 WL 230894, at *8 (D. Md. Jan. 14, 2020) (finding that a later, "more specific" statute ceding land to the federal government "supersedes the more general 1943 statute"); *see also In re Wright*, 826 F.3d 774, 779 (4th Cir. 2016) ("'[A] more general provision should not be applied when doing so would undermine limitations created by a more specific provision.'") (quoting *Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001)).

Maryland did not recognize a private right of action for sex and age discrimination in employment until 2007—well after the land in question is alleged to have been ceded to the federal government. Accordingly, because Maryland did not "specifically retain[] jurisdiction over the subject matter at issue" and Congress did not "specifically authorize[] the enforcement of the state

law on the federal enclave," Maryland's law prohibiting sex and age discrimination in employment does not apply to the conduct at issue which occurred on Fort Meade. *Colon*, 320 F. Supp. 3d at 746. Therefore, Weisel's claims of age and sex discrimination in violation of Maryland law are barred by the federal enclave doctrine.

### *IV.   Conclusion*

For the foregoing reasons, an Order shall enter granting Kaimetrix's motion for judgment on the pleadings as to Count VI (sex discrimination) and Count VII (age discrimination).

DATED this 30th day of April, 2020.

BY THE COURT:

_____/s/_____
James K. Bredar
Chief Judge